Mr. Trela. Thank you, and may it please the Court. This appeal presents three issues, whether claims 1, 2, and 7 of ST's 987 patent are invalid as a matter of law due to obviousness, whether the jury's verdict finding claims 1 and 7 valid but claim 2 invalid are inconsistent and therefore require a new trial, and whether ABS breached Section 16, the confidentiality provision of the party's 2012 agreement. With the Court's permission, I'd like to start with obviousness. The Supreme Court in KSR held that when a patent simply combines old elements in a new combination, with each performing the same function it had been known to perform and yields no more than one would expect from the combination, the combination is obvious. That's the 987 patent. It claims as its invention the combination of two old techniques, the Johnson method of sorting sperm and a photo-damaged cell sorter, and nothing more. Now can I just interject that I find in the party's briefing, and I actually find in the Federal Circuit's case law, an ambiguity about how one approaches obviousness. You can find plenty of statements that say obviousness itself is a question of law for the Court, and then you find things such as juries being asked, do you think this patent was obvious, or do you think whatever, some historical fact is established. How did the District Court handle that problem here, and do you think it was correct? Well, the District Court submitted one question to the jury, is the patent valid, are the claims valid? Neither side objected to that, neither side asked for any sort of special verdict on specific questions underlying that. So we don't think submitting the case that way was an error. The District Court's error was afterwards in making the legal determination of obviousness. The jury's conclusion on the question of obviousness is not a determination of the legal issue. Well, it doesn't really even conclude. If that's just the question, is it a valid patent? It might be valid or invalid for any of a number of reasons. Might not be novel, might be whatever. No, absolutely. In this case, there were two challenges to the validity of these claims, obviousness and lack of enablement. So things like novelty, I suppose, were off the table. But you're absolutely right. But in holding two of the claims not invalid, the jury necessarily found that both of those, both the enablement and the obviousness challenge, did not, in the jury's view, succeed. Now, your opponents argue that the prior art taught away from, that's a phrase they like to use, taught away from this. And there wouldn't have been a motivation to combine the Johnson innovations with, I'm not sure how you pronounce this, the K teaching. And that that's enough to show that when somebody did go forward and blend these two different approaches, that was enough to make it non-obvious and thus patentable. Well, there are a couple of problems with that, Your Honor. One is, it's clear under KSR that a motivation to combine can be found any time that there is some problem known in the field, and in this case, for example, a need for greater speed in sorting, and a limited number, a finite number, the court in KSR said, of possible solutions to that. There is a motivation to combine in that situation. You don't need an express suggestion in some prior art article that says, hey, you should do this. But in this case, in fact, we also have what the Supreme Court in KSR said is really more than you need, which is the express suggestion in K. K says, K is talking about other things, and then he says, this photo damage technique that I'm talking about is particularly suitable when large numbers of cells are needed. And as a result, sperm sorting, as taught in Johnson, and he refers to the Johnson method, is an interesting possibility. And he never says anything like, but unpromising, because I've been using little cells, and sperm cells are more fragile, or anything like that. No, that's exactly right. And here is the problem. First of all, as a legal matter, teaching away requires something that really discourages somebody from going down a particular path, something that says, you know, you might think about doing this, but you really shouldn't do it, because there are problems here. And K plainly doesn't do that. It says, hey, this is an interesting possibility. I haven't done it, but it's an interesting possibility. The other problem with the teaching away argument is ST emphasizes K's statement that the capabilities of his photo damage sorter can be fully exploited with cells that are small and sturdy, and ST says that sperm cells are neither of those. But the problem with that is that what K actually says is that the high speed capabilities of the Zapper, that's his device, quote, can be fully exploited for small and sturdy cells which survive passage through the nozzle at increased velocities. Now, Johnson's article, which is the other piece of prior art that's relevant here, made clear that sperm cells, whether you think they're small and sturdy or not, could survive nozzle velocities right in the range that K was using. And both experts testified to that. And you can derive it from the velocities reported in the K article. So there's nothing about that statement, which is what ST focuses on, that would discourage somebody of ordinary skill who is presumed to know both Johnson and K from putting the two together. The other problem with ST's teaching away argument, I think, is that even as quoted by ST, K's statement that the Zapper could be fully exploited with small and sturdy cells would work best with those doesn't even suggest that it won't work with others, that there wouldn't be advantages to using it with others. Now, remind me, under the 987 patent, there's no particular speed or laser treatment that's specified. Is there? That's something that would be adjusted by the user? That's exactly right. It just says, use the Johnson technique to identify X and Y. And then instead of the droplet sorter method, use the photo damage method. So for certain kinds of cells, you might go faster, and other kinds of cells, you might go slower. Right, and either one of those would be within the scope of the patent claims. There's no requirement of any particular speed or any particular output. And K tested a variety of cells. I think nine different cells are reported there. And his test showed that the various speeds at which he ran his machine were not a problem for any of them. At the upper end of the speed range, it was better for some cells than others. But in the heart of the speed range that he used, all of them did fine. And moreover, a statement in a prior art reference that says a particular alternative is best or is preferred does not teach away from other alternatives. The law is quite clear on that. The fact that some results are better than others does not teach away from putting together, in this case, an obvious combination of two prior art methods. You have a recognized and undisputed need for greater speed. You have, as the patent itself says, three conventional sorting methods. One was Johnson. The other was fluid diversion or something like fluid switching. And the photo damage method, and it was recognized that photo damage was faster. So this is what KSR is talking about. So can I ask, this is probably beside the point, but am I correct that this is still in the development stage that this technology, the 987 technology, has not been commercialized? Well, I'll answer it this way. As ST's, well, no, actually, I can be more forthright. ST accused the system that my client, ABS, is using as infringing the patent, as using this technique. We didn't contest infringement at trial. So it is, if you. So you are currently using a process. We are currently using a process that ST says, and we don't dispute, is within the claims. But prior to that, there was no commercial use of it, no commercialization. So to maybe wrap up on obviousness, this seems to be right in the heart of what KSR is talking about. A recognized problem, a limited number of known solutions, no true teaching away or something that would tell the person of ordinary skill who knows about all the art, don't do this, and you end up with what's claimed in this patent. And that's obvious as a matter of law. So I'd like you to talk a little bit about the dependent-independent claim business. Because it seems to me that you're claiming, your argument is that claim one, the independent claim, has a certain number of features. I'll make up a number and say 10 features. And claim two, the dependent claim, has all of those 10 features plus an 11th feature somehow. Is that correct? I would put it a little differently. What I would say, and I think this is the way independent and dependent claims work, claim one covers a, universe is not the right word, but covers a body of sorting techniques. Claim two subtracts a little from that. It says, Instead of three sorting techniques, it's going to use two, or it's going to use one. Exactly, exactly. You could imagine a claim, an independent claim written, a method for sorting cells that can either use a sort strategy or use cold fusion or use something else. And then claim two is the method of claim one, but limited to using a sort strategy. So it really has to be a subset. That's exactly right. By statute under section 112, it is a subset. Because section 112 says, a dependent claim includes all of the limitations, all of the things that define the scope of the independent claim, plus an additional limitation that narrows it even further. And the case law is very clear that a dependent claim has to be narrower than its independent claim. So you're saying, though, that it's impossible if the independent claim enables the patent. And so a person who is skilled can replicate, produce whatever the independent claim sets forth, that it's impossible for a dependent claim to not be sufficiently enabled. That the written specifications set forth in the dependent claim, that it's not possible that someone couldn't follow those instructions. I believe, yes. Because to be fully enabled, you have to enable the full scope of the claim. Dependent claims are within the full scope of the independent claim. So if the independent claim is fully enabled, that is, the full scope of it is enabled, then a dependent claim necessarily is. But scope is different, right, from enabling? Isn't enabling something that enables someone to replicate or to make what is described? Well, correct. But the case law, at least the Federal Circuit case law, says that to be enabled, the full scope of a claim must be enabled. That is, the patent must teach a person of ordinary skill how to practice everything within the scope of the independent claim without the need for undue experimentation. So I think that, and the cases are also clear, as I said, the dependent claims are narrower by definition than the independent claim. And indeed, dependent claims are embodiments of the independent claim. So you've argued that it would be possible, then, to invalidate the independent claim, but still say that the dependent claim was valid if some of the methodologies specified in the independent claim don't work, but the dependent claim has, in fact, identified the one that does. That's exactly right, Your Honor. To go back to my example, if you had an independent claim says use a source strategy or a cold fusion, well, you can't fully enable it because nobody can do cold fusion. But if the dependent claim says use a source strategy and don't use, it doesn't cover cold fusion, that could be enabled even though claim one, the independent claim, is not fully enabled. And that's the fundamental problem here. But there's also, I think, a factual problem, which is the jury was not given any basis on which to draw any distinctions among the claims in terms of validity. We argued invalidity as a unit. ST defended them as a unit. In fact, its experts said, because claim one is valid, claims two and seven are valid. So there was no factual basis for the jury to go off on a separate theory as to claim two. But even if they had, even if they properly concluded that claim two was invalid because it was not properly enabled, that necessarily would mean that claim one is not enabled either. And so the verdicts are inconsistent. Are there any cases addressing that I couldn't find anywhere? It says that a dependent claim must necessarily be enabled if an independent claim is. I found one, the reverse, but not that. Well, I think the closest that we found was the Alcon research case discussed in our reply brief, which you've seen, which doesn't say it quite the way you did. But I think it stands for the proposition that if a part of a dependent claim is not enabled, as was conceded there, that necessarily affects not only the validity of that claim, but also the independent claim. But phrased precisely as you said, Your Honor, we have not found a case that says just that. If I might turn briefly to the contract issue, the contract claim, basically the finding of breach was based on the fact that five years before the contract was signed, a former employee of ST left with some confidential protocols that she wasn't supposed to take. She then came to ABS and used them there. And that was the supposed violation of Section 16, the confidentiality provision. That provision on its face applies only to information that is disclosed by ST or its affiliates to ABS. That language is clear and unambiguous. What difference does this make? Well, it doesn't. Since you concede that Mean revealed trade secrets, which your client is not allowed to use, why does it matter? Well, one reason it matters is because ST is currently asserting a claim for attorney's fees in the district court based on this supposed breach of contract. Well, you've paid the trade secret violation. We paid the trade secret violation. So this is not a situation where they don't have any redress. Now you're worrying me for another reason. Well, I'm just. If this is an argument about contract and there's some residual pending dispute about it, do we have a final decision? Well, I think you do, Your Honor, under the Rahalic gravel case, which says that requests for attorney's fees are separate from separate proceedings. Well, that's Boudinich against Becton Dickinson, too, in the Supreme Court. But if the worry concerns attorney's fees, why don't we wait and see if the district court awards attorney's fees? Well, the other concern. There doesn't seem to be any substantive worry, given your concession, that your client can't use this information. Well, I think that's right. There is not a substantive worry in the sense that it's affecting our operations. That's absolutely right, Your Honor. But to get back to that just very briefly, whether a contract is ambiguous is a question of law. Under Texas law, we think the district court erred in answering that question. What work does that third party's clause do? The third party's clause, in truth, doesn't do anything. Because what the third party's clause says is that, and it's under subpart 2 of section 16, any information related to sordid semen that is based on or derived from any of the foregoing, in other words, the information provided by ST to ABS, whether by ABS or ST or third parties, that is based on or derived from. So third parties might do the derivation, but there still has to be a threshold disclosure by ST to ABS, and we don't have that here. I'd like to reserve the rest of my time. All right, if you'd like to save the remainder, that's fine. Mr. Shah. May it please the court, Pratik Shah for the appellees. Although ABS tries to characterize the underlying facts as largely undisputed, the key fact questions here on the obviousness issue, motivation to combine and reasonable expectation of success, were subject to extensive and conflicting expert evidence that the jury necessarily resolved in ST's favor. So here's my problem with a lot of the gist of your argument on obviousness. It seems to me to be in quite a bit of tension with KSR, because the whole point in the KSR decision was to evaluate the Federal Circuit's so-called TSM, Teaching Suggestion Motivation Test. And the court said, that's not a rigid test. Obviousness is a much more capacious inquiry. And it seems that in the wake of KSR, the Federal Circuit has chugged right along with TSM. And your argument is very much about that. You're not really arguing about the broader concept of obviousness that the Supreme Court said was what we need to be worried about. Well, Your Honor, I guess I would view our arguments a little bit differently. We fully expect KSR, and we do not accept the TSM test, which the Supreme Court expressly refuted, which you had to point to something in a source that pointed you to the combination. We're not saying that. You can look to anything to get the reasonable motivation to combine. But the point is that obviousness isn't equal to motivation. Motivation is one fact that might lead you down the path of thinking that a particular invention either was or was not obvious. And if people wouldn't have ever thought of putting two different things together, then maybe that's a good sign that it was not obvious, and therefore patentable. But motivation isn't relevant in and of itself. Well, Your Honor, the Federal Circuit jurisprudence is quite the opposite. That is, motivation. I'm not sure they're right. I mean, can we start with the Supreme Court? Sure. And I'm not sure they're relevant. This is not the Federal Circuit. No, and I'm not saying. We make up our own mind. Sure, sure. I'm not saying arguing. We have to follow the decisions of the Supreme Court, and we have to follow the statute. But we are not mechanically trying to follow the Federal Circuit as if this were a diversity case, and we were trying to follow state law. Sure, absolutely. And I think both sides cite the Federal Circuit just because they're the ones that have body of law in this area. These permissive counterclaims, I will grant you, are unusual. Yes, but starting with KSR, what KSR says is it doesn't reject the fact that motivation to combine is one of this, and in most obviousness cases, in reality, in cases where the prior art, you look at different pieces of prior art and you have to combine the difference of pieces of prior art, that's most inventions are involving combining things out there. And precisely, the Supreme Court said that, and they said, look, that's. And here we have the Johnson method that covers everything except photo damaging versus droplet. We've got K, and we have, let's just play around with these methodologies. It seems to me that's very straightforward. Sure, Your Honor, and what KSR says, look, there's going to be a certain subset of cases where a judge can look at it, and common sense will lead you to believe you can just combine these two resources. And that compels, as a matter of law, the conclusion of obviousness. So you don't need to defer to jury fact-finding on whether there was a motivation to combine or not. But are you arguing to me that obviousness is a jury question? No, Your Honor, it's not. It's ultimately a question of law. But what has been well-established, and the Supreme Court would not disagree with this, and I'm not saying it's binding on you, but if you look at the Federal Circuit's Arctic CAT decision, which is its most recent and comprehensive treatment in light of KSR, how to treat jury verdicts of non-obviousness. It was issued two months ago, cited in our brief. What that case explains is, look, the jury, there are two sets of cases. One in which a judge can look at it. The technology is relatively simple. And this is what KSR says. The cases that they cite, wires and ABT. Explicitly, the Federal Circuit says, look, when technology is relatively simple, and a judge can look at it and say, yeah, it's pretty obvious to combine these two, in those cases, those are the ones that are amenable to summary judgment, or judgment as a matter of law. But when you have technologies like this, and- What's so complicated about this? Well, Your Honor, we had PhD experts who had a two-week trial arguing about the nature of sperm cells, and here's the fundamental problem. And this is set forth in our brief at 26 to 30. You can read. We cite the trial transcripts. This was the principal- I have the text credit. Yeah, the principal dispute at trial is, would this method, would an expert, and here's the question, person of ordinary skill in the art, at the time of the invention, would they have had a reasonable expectation of success? Would they have had a good reason to combine these technologies? And Kay signals to them, this is worth a try. That's what he says. He doesn't ever say, and it's not going to work. He has different kinds of cells that he's used, his eight or nine different types of cells. He doesn't do it with sperm cells. Besides Johnson, he knows that Johnson is out there. So apparently everybody in the business knew Johnson was out there. Yes, so a couple points there. What he does say is an interesting possibility. Right, that doesn't sound like teaching away to me. That sounds like teaching toward. Sure, Your Honor. And even putting aside, teaching away is a matter of degree, and this is sort of explained in the case law. So you're giving up teaching away? Because I don't see that happening here. So Your Honor, this is why the expert testimony is relevant in a case like this. The experts at length testified, and this is at A270 to 275 in the record. But why you would take in cage, he said this works for small and sturdy cells. The experts. That's what you can infer from Kay. But he says it might be interesting in this other application. He has one sentence. And the Supreme Court has told us not to be wedded necessarily even to the experts. Sure. It's a question of law. Well, Your Honor, but the underlying question of motivation to combine is a factual question. And that was the principle of experts. And no special verdicts were given to this jury to answer that question. No, Your Honor. And when there is no special verdict, they did not request one. When there is one, you take, just like any other trial, you assume all of the factual findings in favor of the verdict winner. Here, ample expert testimony that small and sturdy cells were very different than the unique, large, and fragile sperm cells. And there was good reason why you would not expect the photo-damaging technique in Kay to work with these cells. So Kay was just wrong. Yes, that was what a person of ordinary skill in the art would not have had a reasonable expectation of success. And here's the reason why. I don't see this at all. But anyway. Well, Your Honor, it's in the expert testimony at length. And there's scientific reasons why. Large and fragile cell sperm cells, once they are damaged, do the photo-damaging. It depends on the speed, though, doesn't it? And this patent doesn't solve that problem. This patent doesn't in any way specify rates. Sure, Your Honor. But their entire argument as to why you would have wanted to combine Kay and Johnson is so that you could do it faster. Well, and you could double or triple the speed without running into problems under this method. Well, Your Honor, the Johnson, and this is a little bit to clarify, Kay does not cite the Johnson source that's at issue here. It cites a 1989 Johnson source. The Johnson that is the prior art in this case is from 1999, five years after Kay does not mention photo-damaged sorting. And in fact, Johnson, what Johnson says, and this is at A613, he essentially says, look, I have solved the problem of high-speed sorting. I've developed droplet sorting that can do it at higher speeds. The problem, as the experts testified, is 60 times faster than the old droplet sorter that Kay cited from 1989. The problem is, an expert said, well, if you tried to do photo-damaging at that speed with sperm cells, it will not work because sperm cells are large and fragile and you have a leaky laser. Once the sperm cells are damaged, unlike the types of cells that Kay tested, they cannot repair themselves. Sperm cells cannot repair themselves. And in a reproductive technology, that is the ballgame. A damaged sperm cell does you no good. So there is ample testimony. It's certainly past the substantial evidence standard. But that's, again, you're arguing facts. I'm arguing facts. You're not arguing facts. Sure, I'm arguing the two principal underlying factors of obviousness, motivation to combine and reasonable expectation of success. If you accept that the jury resolved those in our favor, then it is a pure legal question. Then it's a legal question that, notwithstanding all of that, with somebody looking at the elements of the Johnson approach and changing just the one factor, how you're going to select the cells, either for division or for photo-damaging or for whatever, what final process are you going to try? And why wouldn't you try one of the other two processes out there? Well, for all the reasons that the experts testified at trial, that because sperm cells are fundamentally- Seems like this was well known in the industry that one could handle cells in different ways. And you'd like us to get down to the very granular level of the sperm cells. Well, Your Honor, this method in the 987 patent only applies to sperm cells. I know, I know. So the question is, would you use it to sperm cells? And remember, Kay was in 1994. Five years later is the Johnson source, in 1999, after much research, saying, I've developed a high-speed method of droplet sorting, does not mention- But that's the key, he doesn't mention. He doesn't say, and I tried three or four other things and didn't find them satisfactory. Sure, but you have the leading- None of that. Conceitedly, the world's leading expert on sorting sperm, not trying that method. So you draw from zero what? So- Zero? Well, the fact that he did not even try it, the fact that the experts at trial, who testified to what a person of ordinary skill in the art would have thought was possible in 2003, said because sperm cells can't be recared, because they're large and fragile, because they're fundamentally different than the types of cells that Kay used in photodamaging, you would not combine, it would not be obvious to combine these matters. So the question is, can the court say, as a matter of- That's a very low standard, I think you have, of non-obviousness. And I think that's a little inconsistent also with where the Supreme Court's been going. Well, Your Honor, again, the Supreme Court accepts that motivation to combine a reasonable expectation of success or the cynical unknown of obviousness, the question is, can you have- The court has scolded the Federal Circuit on more than one occasion for too readily assuming that certain subject matter is patentable. Yes, under 101, that's right, but this is an obviousness case. And to be sure, we're not arguing you can never have summary judgment. They're essentially arguing you can look at these two sources, as you've explained, Kay in 1994, Johnson- But there certainly are some advances in science that aren't patentable. Oh- It hasn't been done before, but somebody with ordinary skill in the art is fiddling around and they decide, let's try this instead. So some things are not patentable, and then some things are enough of a leap forward. They used to call the obviousness standard the constitutional standard of invention, that the purpose of Article I was to encourage these advances. But as the court points out, it's not to stifle invention either. So the question for this court is, is it common sense that this should have been a summary judgment case, that you can just look at these two pieces of art and say, ah, any person of ordinary skill in the art would have combined them and come with this invention. Again, we submit this is not like a case like ABT or WIRES, where you had what the federal circuit says, these are simple technologies that a court can look at and say, no. Here we have PhDs arguing about the differences in sperm cells, real reasons why. You have the PTAS. So you always have obviousness then, whenever PhDs have to testify? No, Your Honor. What I'm saying is, there are appropriate cases for summary judgment on obviousness. They are far afield from a case like this, where there are real reasons why, when even if a layperson looks at these sources and say, ah, easy enough, I'll just combine them. There are real reasons deterring that. And the real reasons are sperm cells are very different. They can't repair themselves. They're large and fragile. They break up during the shear velocity. All of these different reasons. And remember, there was an inter partes review instituted here by the other side in the Patent and Trial Appeal Board that made just that argument, that said, look at these two sources on their face to a board of experts, the patent judges. But then didn't further events happen with that? No, Your Honor. That was not instituted. And what the PTAB said was, because the interesting possibility language in CAGE is, quote, too slender a read to rely on in light of all of the other technology problems with respect to sorting cells. Now, what they cite in their reply brief is another inter partes review proceeding, which you may be referring to. What they don't tell you is, that's a different patent involving different claims, not involving photo damaging, and involving different prior art. They say it involves Kay and Johnson, but it's a different Johnson from 1989, not the Johnson that you have here. So if, in fact, common sense compelled the conclusion that these were obvious, that means that the PTAB got it completely wrong, the district judge got it completely wrong, the jury got it completely wrong, and that a judge could try. Well, I don't know what the jury thought. Maybe we should turn to the jury's decisions about the dependent and the independent claims. Sure. Since that's sort of a backup argument that your opponents have raised. So it seems to me quite sensible that if the independent claim is found to be invalid, you might still have a perfectly valid dependent claim, because it's narrowed to one of several possible ways of practicing the independent claim. I don't see the other way around. I don't see how you can get an invalid dependent claim and a valid independent claim. Your Honor, there is a way around that. And just to give it a simple example to take it out of complicated technology like this, if you had a patent covering a recliner, right? The recliner has a headrest, a reclining mechanism, and a footrest. There is your independent claim, and you could say that's fully enabled because they describe how to build that recliner. You would then have a dependent claim that says we're gonna make that footrest adjustable. Now, the specification in the patent may not disclose how to make that footrest adjustable. The independent claim, fully enabled, you can build it, but you have not disclosed how to do the adjustable footrest. That is a perfectly classic example, simple example, and that is why Chisholm- Is that a proper dependent claim? I think we have a difference in definition because I don't see how, the dependent claims, as I understand, have to subtract from the independent claim, not add to. I certainly can see in your case that you might not show how to do that, but you're imagining a dependent claim that adds to the independent claim. Your Honor, they are a narrower subset, but I think the addition- No, no, you've added the adjustability feature. Well, Your Honor- You haven't subtracted from the independent claim. Well, in the parlance of patent claims, and the recliner is the independent claim, when you add a functionality, it is a subset of the original claim. Why is that a subset? When you're adding something instead of subtracting, you could say there's no footrest, and now you have an independent claim with a headrest and the chair and a footrest, and you'd have a dependent claim of just the headrest and the chair. How it works is the court assumes that you've claimed everything within the meaning of the independent claim. So you've claimed the headrest, the reclining, the footrest. That is the entire universe. If you are going to add a functionality that is a subset of it, so now- It's a subset, right. Well, counsel, let me ask this way. Let's say your patent and independent claim is for a recliner, but maybe somebody would prefer for the footrest to be taken off. Is it possible, and call that the dependent claim, making the recliner minus the footrest. Detachable. Right. Is it possible, that's a subtraction, right? Would it be possible then for the dependent claim to not be fully enabled because you haven't given sufficient instructions about how to pull it off? Absolutely, Your Honor. That's a very good example, and that is why they have zero authority. And Chisholm, the leading patent treatise, it sides with us, that says you could have a dependent claim that's not fully enabled because it's not fully disclosed in the specification, even when the- Because it adds functionality. Because- It doesn't subtract. It doesn't pick one of three or four ways. It adds functionality. Your Honor, I think the addition of- Is that what Chisholm says? I'd be surprised. I'll quote the language from Chisholm, so I'm not mischaracterizing it. This is what it says. A dependent claim may not be patentable despite the allowability of the independent claim because of the absence of support in the specification for the added limitation. A dependent claim always has an added limitation. The addition and subtraction terminology is a little bit off. It's an added limitation because it is a subset that you have to show how it works in order to get the dependent claim. That is why it is commonly accepted that you can have an independent claim that is fully enabled but not a dependent claim. And they even accept it- And you have cases that illustrate this? We have the leading patent cases. The best cases are in the written description requirement. Which they- But you don't have cases then that are exactly- We do have a district court case, Chiron, which accepts it. The reason why there is not much case law on this is people don't argue this because it's just contrary to how patent law is done. Now, the written description cases- That's a pretty amazing claim, actually. People don't seem to hesitate to litigate patent things. Well, your honor, Chisholm clearly states the rule, the written description cases, which they don't dispute that in the written description requirement that this rule is correct. They say, oh, Chisholm is only talking about written description requirement, which it's not. That section applies to enablement and written description. But even if it were only talking about written description, there's no distinction between enablement and written description for these purposes. Both require the full scope of the language that they rely on to be described in the specification for enablement, how it works, for description, full scope of the description. If it's good enough for written description, it has to be good enough for enablement. There's no distinction. Counselor, can I ask you a question about the contract claim quickly? Sure, yeah. Under Texas law, is it possible to consider this Cathy Mean business before the contract is found unambiguous, or could this Cathy Mean evidence only come in once it was found to be ambiguous? The former, your honor. Texas does not follow the four corners approach as the cases that we cite. What it does, in order to determine whether a contract is unambiguous or not, you look at the surrounding circumstances first. And then you construe the language in light of the circumstances. So our submission is given that one of the primary things they were negotiating around when they were doing this agreement was the potential that Cathy Means took this information with her on the way out the door and shared it with ABS. You have to construe the language of section 16 of the agreement in light of the fact they were trying to capture that event. And when you construe it in the light of that, we don't think the language unambiguously excludes the scenario where you have this sort of unauthorized disclosure. It talks about disclosure, the fact that it's unauthorized. How do you deal with the language in this paragraph that defines confidential information? It's right after the sentence about third parties. It says, ST's confidential information shall encompass all of the foregoing information, whether provided by ST, in writing, orally, or by other means. So provided by ST is the part in that sentence that causes me to question because I don't see how ST provided the means information. Sure, Your Honor, and certainly if you were- So you're not reading that sentence out, I assume. No, I'm not reading that sentence out. But when you read sentences like disclosure by ST, provided by ST, obviously this is not the heartland case where you have the formal authorized disclosure from ST. But what you have is an ST employee on her way out the door- Is she ST? Taking the binder with her. Yes, Your Honor. She was working for ST and ST's subsidiary. She hasn't been ST for five years. Oh, Your Honor, but our claim goes back to the initial. So how this worked is, on her way out the door five years ago, she took this binder with her. She continued to use that information on behalf of ABS through 2015. That's the undisputed record. This agreement was signed in 2012. So there was a violation through 2015. That's undisputed. And so that's why this 2012 agreement is relevant. Seems like a clumsy way to write about unauthorized information on someone who is not an ST employee and was by no means authorized by ST to be handling this information. Your Honor, I- Especially if it was the primary concern driving the provision. Yeah, I agree with you, Your Honor. It's not a model of clarity. But the only question is, when you read it in light of that objective, is it at least ambiguous enough that it would cover this sort of unauthorized disclosure by an ST employee on her way out the door? It seems like black is white and white is black. But maybe it's better than that. We'll see. If there are no further questions, Your Honor. I see none. So thank you very much. Thank you. You have about two and a half minutes, Mr. Trelo. Thank you, Your Honor. Let me go to the inconsistent verdict point first. Chisholm absolutely does not support the proposition that was just articulated. He's talking about written description. When he talks about enablement in the footnote to that section, he's talking about what we were talking about earlier, where a narrower dependent claim may be fully enabled, but the independent claim is not. And that also, incidentally, is what the Chiron case that counsel cited is about. It's about a fully enabled, narrower dependent claim, but that has nothing to do with whether the independent claim is also enabled. So that's just incorrect. Now, on obviousness, counsel talked about all the PhDs and all these problems and all that, but that loses sight of what the motivation to combine is about and what the reasonable expectation of success is about. What you need is a motivation to combine the prior art methods to produce the claimed invention. You need a reasonable expectation of success in producing the claimed invention. The patent here doesn't address any of these supposed problems, the laser leakage and the lag times and all of that. It just says, put these two things together. And so the question is, would somebody of ordinary skill, looking at Kay, looking at Johnson, have a reasonable expectation that putting those together would produce the claimed invention, which says nothing about special treatment for sperm cells or any of these supposed problems. The case law from the Federal Circuit, which I understand is not binding here, but nonetheless, I think is relevant, makes clear that a patent owner cannot rely on supposed prior art problems or features that aren't disclosed in the prior art when the patent itself doesn't include that, doesn't solve those problems. The Metzl Minerals case is about that. Muni Auction is about that. There are other cases cited in our briefs are about that. So the fact that there may or may not have been these problems, the fact that some PhD may have talked about them, makes no difference where the patent itself doesn't deal with any of this, because what you need the motivation to do is to come up with what the patent came up with, and it doesn't solve those supposed problems. The last thing, just on the contract question, we don't agree that Texas law allows you to look at extraneous circumstances before you decide whether the language is ambiguous. And the final point on that, Judge Wood, as you pointed out, if there truly was a meeting of the minds on having this contract address the Cathy Mean situation, it would have been very easy to do that in Section 16 by just changing the definition of ST's confidential information. The fact that it's still tied to information provided by ST just takes the Cathy Mean situation right out of it. If there are no questions, thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.